

# In the Missouri Court of Appeals
# Eastern District

**DIVISION FOUR**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., | ) | No. ED112950 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | Cause No. 24SL-JU00164 |
| | ) | |
| JUVENILE OFFICER, | ) | Honorable Jason D. Dodson |
| | ) | |
| Respondent. | ) | Filed: September 16, 2025 |

## *Introduction*

C.B. appeals from a judgment entered by the juvenile division of the Circuit Court of St. Louis County (the juvenile court), dismissing the juvenile proceedings against him and granting the Juvenile Officer's motion to transfer him to a court of general jurisdiction for criminal prosecution as an adult. On appeal, C.B. argues he was deprived of his right to effective assistance of counsel during his certification proceeding. We resolve the question of which framework to use to analyze a claim of ineffective assistance of counsel in a certification proceeding, and we affirm.

## *Background*

C.B. was born on March 15, 2007. On March 8, 2024, seven days before C.B.'s 17th birthday, the Juvenile Officer filed a petition with the juvenile court asserting that C.B

was in need of care and treatment both under Section 211.031.1(2)[1] for behavior that was injurious to his welfare or to the welfare of others, and under Section 211.031.1(3) because he was alleged to have violated state law. Specifically, the petition alleged that on January 6, 2024, C.B. had committed the class A felony of murder in the second degree and the unclassified felony of armed criminal action (ACA). Contemporaneous to the petition, the Juvenile Officer filed a motion to dismiss the petition before the juvenile court to allow C.B.'s certification and prosecution as an adult.

At a hearing on the Juvenile Officer's motion to dismiss, the deputy juvenile officer (DJO)[2] gave the following testimony. The DJO, having considered each of the ten mandatory factors, recommended that C.B. be certified as an adult. In reaching his recommendation for certification, the DJO concluded that the offenses with which C.B. was charged—murder in the second degree and ACA—were serious in nature and involved viciousness, force, and violence against a person, resulting in the loss of a life.

The DJO recounted the circumstances surrounding the charges, as conveyed in the police report. On January 6, 2024, C.B., who resided in East Saint Louis, Illinois, was driving a vehicle with Witness sleeping in the front passenger seat, and Victim plus two co-defendants sitting in the back seat. C.B. drove the vehicle from East Saint Louis, Illinois to St. Louis County, Missouri, where Witness was awakened by the sound of gunfire, after which C.B. and the two co-defendants reentered the vehicle without Victim. Victim's body was later discovered deceased with gunshot wounds to the head, torso, leg, and arm. During

---

[1] All statutory references are to RSMo. cum. supp. 2024, unless otherwise indicated.
[2] The deputy juvenile officer testified that he was assigned to the Investigations Unit within the juvenile office, and that his job included assessing and investigating felony referrals and constructing certification reports and recommendations, under the direction of the Juvenile Officer.

a subsequent search of C.B.'s home, law enforcement discovered a gun that matched ballistics found at the scene of the homicide.

In addition to the details of the alleged crime, the DJO considered C.B.'s personal history. The DJO noted that C.B. did not have a pattern of repeated offenses, and that C.B. had no prior offenses in Missouri, although C.B. had a pending probation proceeding in Illinois for defacing a firearm. The DJO noted that C.B.'s behavior in detention had been "excellent." The DJO stated that C.B. was mature and sophisticated for his age, noting that during their interviews, C.B. was able to articulate his thoughts, advocate for himself, and have rational conversations. The DJO had considered options for community-based supervision, commitment within the Missouri Division of Youth Services (DYS), and other facilities and programs, but he concluded that none of these options were appropriate, in light of the serious nature of the alleged offenses. Likewise, the DJO determined C.B. had no mental health issues that would make jurisdiction and commitment in the Department of Mental Health appropriate. The DJO did not consider C.B.'s race in his certification recommendation.

On cross-examination, certification counsel for C.B. elicited information from the DJO that in the fall of 2023 before this incident occurred, C.B. had been involved in a car accident in which his leg was injured, preventing him from attending school, and that also resulted in the death of a good friend, affecting C.B. emotionally. Further, the DJO agreed that, despite C.B.'s apparent maturity, his initial education assessment scores indicated he only read at an elementary school level. Moreover, the DJO agreed that C.B. had a risk assessment score of zero, correlating to a low risk of reoffending, and that the DYS can house juveniles until the age of 21. Certification counsel argued to the juvenile court that the DJO made his recommendation solely due to the nature of the crime—for which there

3

was only evidence that C.B. was the driver and none that he participated in the actual homicide—and the DJO failed to consider any other factors.

After the hearing, the juvenile court granted the Juvenile Officer's motion to dismiss and certified C.B. for prosecution as an adult.

## *Discussion*

In his sole point on appeal, C.B. argues the juvenile court erred in granting the Juvenile Officer's motion to dismiss and to certify C.B. for prosecution as an adult because C.B. received ineffective assistance of counsel during the certification proceedings, in that his certification counsel did not present evidence from an expert in adolescent brain development at the certification hearing, resulting in prejudice. We disagree.

### 1. Standard of Review

A claim of ineffective assistance of counsel during a certification proceeding is cognizable on direct appeal, so long as the record is sufficient to allow proper review of the claim. *C.R.B. v. Juvenile Officer*, 673 S.W.3d 135, 138-19 (Mo. App. W.D. 2023). The issue of what procedure to follow in reviewing a claim of ineffective assistance of counsel in a juvenile case is a question of law that this Court reviews de novo. *D.C.M. v. Pemiscot Co. Juv. Office*, 578 S.W.3d 776, 782 (Mo. banc 2019).

### 2. The Proper Framework under which to Analyze a Claim of Ineffective Assistance of Counsel in a Certification Proceeding is the Two-Part Test Set forth in *Strickland v. Washington*[3]

Appellant argues that his certification counsel was ineffective at his certification hearing. Missouri courts have not yet determined a framework under which to analyze a claim of ineffective assistance of counsel in a juvenile proceeding. Juvenile proceedings

---

[3] 466 U.S. 668 (1984).

are civil, not criminal, with a focus on care and rehabilitation rather than punishment. *Interest of A.C.C.*, 561 S.W.3d 425, 428-29 (Mo. App. E.D. 2018). Accordingly, due process protections for juvenile proceedings arise under the Fourteenth Amendment, rather than the Sixth Amendment, which applies to criminal prosecutions, and juvenile proceedings need not conform to all of the requirements of a criminal trial. *Id.*; *see also Application of Gault*, 387 U.S. 1, 30-31 (1967). Nevertheless, the Fourteenth Amendment requires juvenile proceedings to provide "the essentials of due process and fair treatment." *A.C.C.*, 561 S.W.3d at 429. These essential rights under the Fourteenth Amendment include the right to counsel during a certification hearing. *Interest of K.M.F.*, 668 S.W.3d 302, 306 (Mo. App. E.D. 2023). The right to counsel presumes that counsel must be effective. *D.C.M.*, 578 S.W.3d at 782; *see also Kent v. United States*, 383 U.S. 541, 561 (1966) ("The right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice.").

The Supreme Court of Missouri in *D.C.M.* posited that courts should use either the "meaningful hearing" analysis or the two-step analysis set forth in *Strickland v. Washington*; however, the Supreme Court of Missouri did not conclude which standard to use because, in that case, the record was insufficient for any analysis. *D.C.M.*, 578 S.W.3d at 784, n.11. The "meaningful hearing" standard applies in other proceedings before the juvenile court, such as in a termination of parental rights (TPR) hearing, and this standard requires merely that the attorney provided the client with a meaningful hearing. *Id.* (citing *In re J.P.B.*, 509 S.W.3d 84, 97 (Mo. banc 2017)). By contrast, the *Strickland* standard applies in criminal cases, and it requires that, to be effective, counsel must both exercise a level of skill and diligence that a reasonable attorney would have used under similar circumstances and that any deficiency in counsel's performance must not have prejudiced

5

the defendant. 466 U.S. 668, 687 (1984). In either analysis, the burden of proving ineffective assistance falls on the defendant. *Id.* Here, both C.B. and the Juvenile Officer argue that *Strickland* provides the appropriate analysis.

Rather than resolving which standard to apply, thus far Missouri courts have universally performed both analyses. Each time a court has considered the issue, the court has determined that, even applying the more demanding *Strickland* analysis, the defendant could not establish ineffective assistance of counsel, which likewise satisfied the less stringent "meaningful hearing" standard. *See*, *e.g.*, *K.M.F.*, 668 S.W.3d at 308. We decide this issue for the first time, and we conclude that *Strickland's* two-step analysis is the appropriate framework under which to consider C.B.'s claim.

Across the states, there is no uniform standard for evaluating claims of ineffective assistance in the juvenile courts. The majority of states have found that, as in adult criminal trials, where the proceeding involves the potential loss of liberty, reviewing courts measure the effectiveness of counsel under the two-part analysis set forth in *Strickland*. *See*, *e.g.*, *State v. Jack*, 144 N.J. 240, 248 (N.J. 1996) (although principles underpinning *Strickland* developed in context of criminal jury trials, they apply equally in context of juvenile proceedings that determine whether juvenile will be transferred to adult criminal court); *see also S.H. v. State*, 197 P.3d 636, 644 (Utah 2008) (applying *Strickland* to S.H.'s claim of ineffective assistance at juvenile court retention hearing, after which S.H. was tried as adult); *In re R.D.B.*, 20 S.W.3d 255, 258 (Tex. App. 2000) (applying *Strickland* test to juvenile's claim of ineffective assistance of counsel at "release or transfer" hearing, which determined that juvenile would be transferred to adult prison to complete sentence).

However, at least one state has distinguished between what constitutes effective assistance for criminal procedures protected by the Sixth Amendment and for civil

6

procedures protected by the Fourteenth Amendment, such as TPRs and juvenile hearings. In *A.M. v. State*, the Indiana Supreme Court acknowledged that *Strickland* applies only to criminal defendants and flows from the Sixth amendment rights relevant in criminal prosecutions. 134 N.E.3d 361, 365 (Ind. 2019); *see also Strickland*, 466 U.S. at 685-88 (defining right to effective assistance of counsel afforded to *criminal* defendants by Sixth Amendment). The court further considered the different, more involved role of a juvenile judge compared to a neutral criminal judge, yielding different expectations for the advocate. *Id.* at 367-68. The Indiana Supreme Court concluded that because the role of an advocate in a juvenile case has a different, more flexible focus on the best interest of the child, their performance as an advocate should be judged under a different lens than a criminal advocate. *Id.* at 366. Thus, the court in *A.M.* concluded that *Strickland* was not the appropriate framework to judge the effectiveness of counsel in cases involving juvenile matters, such as certification hearings, juvenile delinquency, and TPR proceedings.

In determining our approach here, we note that in Missouri, as in *A.M.*, juvenile proceedings, including certification proceedings, need not conform with all the requirements of a criminal trial, as long as they conform with "the essentials of due process and fair treatment." *J.N.W. v. Juvenile Officer*, 643 S.W.3d 618, 634 (Mo. App. W.D. 2022). Further similarly, in Missouri as in *A.M.*, courts apply a non-*Strickland* test to claims of ineffective assistance before juvenile courts, such as in TPR hearings. *In the Interest of T.A.G.*, 679 S.W.3d 561, 564 (Mo. App. E.D. 2023) (test for whether counsel provided effective assistance of counsel in TPR cases is whether counsel provided parent "meaningful hearing"); *A.M.*, 134 N.E.3d at 365. By contrast, states that apply *Strickland* to claims of ineffective assistance of counsel in juvenile certification hearings, also apply *Strickland* in TPR cases. *See, e.g.*, *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021) (as in criminal

7

cases, ineffective-assistance-of-counsel claims in TPR cases are governed by *Strickland*); *N.J. Div. of Youth & Family Servs. v. B.R.*, 929 A.2d 1034, 1037-38 (N.J. 2007) (same); *In re E.H.*, 880 P.2d 11, 13 (Utah App. 1994) (same). It appears that, should Missouri likewise apply this uniform approach to all claims of ineffective assistance of counsel stemming from proceedings before the juvenile court, then Missouri would apply the meaningful-hearing test used in TPR hearings. *See T.A.G.*, 679 S.W.3d at 564.

However, we also consider the federal treatment of this matter, which supports a conclusion that *Strickland* is the proper test. Federal courts have recognized that a juvenile certification proceeding is a critically important stage at which the juvenile is entitled to effective assistance of counsel. *Kent*, 383 U.S. at 544, 560 ("determination of whether to transfer a child from the statutory structure of the Juvenile Court to the criminal processes of the District Court is 'critically important'"). Even though the requirement for effective counsel in a civil juvenile proceeding arises under the concept of fundamental fairness rather than the Sixth Amendment, our survey of federal district courts reveals that the general consensus is that *Strickland* is still the proper framework under which to judge a claim of ineffective assistance of counsel in juvenile certification proceedings. *See*, *e.g.*, *Matthews v. Lumpkin*, 2020 WL 6271212, \*19 (S.D. Tex. 2020) (not reported) (applying *Strickland* analysis to juvenile's claim that he received ineffective assistance of counsel at hearing determining whether to transfer him to adult court); *Morales v. U.S.*, 2010 WL 3431650, \*10 (S.D.N.Y. 2010) (not reported) (applying *Strickland* analysis to juvenile's claim that juvenile received ineffective assistance of counsel at hearing determining whether to transfer him to adult court); *see also* Fed. R. App. P. 32.1 (allowing citation of unpublished federal judicial dispositions issued after 2007). Further persuasively, the United States Supreme Court has stated that, when it has not provided a standard for

ineffective-assistance-of-counsel claims that applies under the particular circumstances, the appropriate standard to use is *Strickland*. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009).

Certainly, essential due process considerations apply in any proceeding that carries the possibility of a deprivation of liberty, even if part of the juvenile system. *See Gault*, 387 U.S. at 36 ("proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution"). While a certification hearing itself does not result in the deprivation of liberty, it is a critical step before a juvenile can enter the adult criminal system. Should the juvenile be certified as an adult after the certification hearing, then the juvenile enters the adult criminal system, at which point any claim of ineffective assistance of counsel is considered under the *Strickland* framework. It is logical that the process by which one enters the criminal system be protected by the more demanding *Strickland* standard as well.

**3.  Certification Counsel Here Did Not Provide Ineffective Assistance of Counsel**

Having concluded that *Strickland* is the correct framework under which to consider C.B.'s claim of ineffective assistance of counsel in his certification hearing, we now apply that test and conclude that certification counsel's performance here was not insufficient and did not result in prejudice to C.B.

*A.  Counsel was not Ineffective*

To establish ineffective assistance of counsel under *Strickland*, C.B. must first demonstrate that his certification counsel failed to exercise a level of skill and diligence that a reasonable attorney would have used under similar circumstances. 466 U.S. at 687. In assessing counsel's performance, we presume that counsel acted professionally and that

9

any challenged action was part of counsel's reasonable trial strategy, and the party asserting ineffective assistance bears the burden of overcoming this presumption. *Flaherty v. State*, 694 S.W.3d 413, 421 (Mo. banc 2024). In general, witness selection and the introduction of evidence are questions of strategy and are virtually unchallengeable on appeal. *Johnson v. State*, 333 S.W.3d 459, 463-64 (Mo. banc 2011).

Here, C.B. argues that reasonably competent counsel would have presented evidence from an expert on adolescent brain development, who would have testified that C.B. could be rehabilitated by the juvenile system. His argument cannot overcome our presumption that certification counsel's decision was part of a reasonable strategy. *See Flaherty*, 694 S.W.3d at 421; *Johnson*, 333 S.W.3d at 463-64.

Section 211.071 sets out the procedure to certify a juvenile for trial as an adult, providing a non-exhaustive list of ten factors for the juvenile court to consider in determining whether a juvenile is the proper subject of the juvenile system. Courts have already considered the issue of what weight to give expert testimony on adolescent brain development in determining whether a juvenile is the proper subject of the juvenile system. *Interest of D.G.J.*, 669 S.W.3d 169, 174 (Mo. App. E.D. 2023). In *D.G.J.*, this Court found that evidence of adolescent brain development was not an enumerated statutory factor juvenile courts were required to consider. *Id.* This Court further concluded that, in determining whether to certify a juvenile as an adult for trial in a general criminal court, evidence of adolescent brain development was less persuasive than evidence concerning the character and nature of the crime. *Id.*

Because the juvenile court here was not required to consider adolescent brain development under Section 211.071 or caselaw, C.B.'s certification counsel was not required to present this evidence and thus was not ineffective for not doing so. Certainly,

10

while C.B.'s certification counsel *could* have submitted evidence of adolescent brain development, Missouri courts have not found this evidence to be persuasive in the past. *See D.G.J.*, 669 S.W.3d at 174. We will not find counsel ineffective for failing to raise an argument that Missouri courts have previously found unconvincing.

### B. C.B. was not Prejudiced

Even if certification counsel's performance had been deficient, which we do not find, no prejudice resulted from the alleged deficiency. To establish prejudice, C.B. must demonstrate there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. C.B. contends here that if certification counsel had introduced evidence from an expert on adolescent brain development about his capacity for rehabilitation within the juvenile justice system, there was a reasonable probability the juvenile court would have denied the Juvenile Officer's motion to certify C.B. as an adult for prosecution. We disagree.

Our review of the juvenile court's judgment shows that the juvenile court here focused primarily on the character and seriousness of the alleged crime. Section 211.071 sets forth ten criteria that juvenile courts must consider in deciding whether the juvenile court should retain jurisdiction or certify a juvenile as an adult for prosecution. These factors include the characteristics of the juvenile's offense; the juvenile's history, behavior, age, and sophistication; the programs and facilities available to the juvenile court; whether the juvenile could benefit from programs available to the juvenile court; and racial disparity. Section 211.071.6[4]; *K.M.F.*, 668 S.W.3d at 309. The juvenile court is not

---

[4] In full, Section 211.071.6 reads:

> A written report shall be prepared in accordance with this chapter developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper

11

required to give equal weight to the listed factors; rather, the first three factors are the most critical. *Id.*; *State v. Thomas*, 70 S.W.3d 496, 504 (Mo. App. E.D. 2002).

The first factor evaluates the seriousness of the offense alleged and the need to protect the community, and this factor "dominates our inquiry." *K.M.F.*, 668 S.W.3d at 309 (citation omitted). Here, regarding the first factor, the juvenile court found that the pending

subject to be dealt with under the provisions of this chapter and whether there are reasonable prospects of rehabilitation within the juvenile justice system. These criteria shall include but not be limited to:

(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

(2) Whether the offense alleged involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

(6) The sophistication and maturity of the child as determined by consideration of his or her home and environmental situation, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

allegations against C.B. were "extremely serious in nature," detailing that C.B. was alleged to have acted with others to transport Victim from Illinois to Missouri where they shot him multiple times, killing him. Regarding the second factor, whether the offenses involved viciousness, force, and violence, the juvenile court found that the allegations against C.B. involved all three and indicated "a complete disregard for community safety and human life." Regarding the third factor, which states that alleged offenses against persons are to be given greater weight than alleged offenses against property, especially when personal injury results, the juvenile court found that the alleged crime here was against a person and resulted in death. The juvenile court concluded that the first three factors weighed "heavily" in favor of certification.

The juvenile court specifically considered each of the remaining seven factors, but it concluded that the first three factors overrode them, which is consistent with Missouri law. *See K.M.F.*, 668 S.W.3d at 309; *see also Interest of J.M.J.*, 707 S.W.3d 877, 884 (Mo. App. E.D. 2025). Although C.B. argues that expert testimony about adolescent brain development could have changed the outcome of the certification proceeding, this argument is pure speculation and does not demonstrate why the juvenile court would have found that C.B. was a proper subject for the juvenile system. "Mere conclusory speculations of prejudice … are not considered substantive evidence of counsel's ineffectiveness." *Coleman v. State*, 640 S.W.3d 159, 167 (Mo. App. E.D. 2022) (citation omitted). C.B. suggests on appeal that an expert would have testified generally that the nature of brain development allows adolescents to be rehabilitated in a short period of time. We are not convinced that general testimony about the nature of brain development would have been more persuasive than the facts unique to C.B. that were already adduced by

13

certification counsel at the hearing here, such as C.B.'s lack of prior offenses and his excellent progress in DYS.

Because there is no basis here upon which to conclude that the juvenile court would have reached a different certification decision had certification counsel introduced expert testimony about adolescent brain development, C.B. has failed to meet his burden on appeal to show he was prejudiced by certification counsel's alleged error. C.B.'s claim of ineffective assistance of counsel fails.

Point denied.

### *Conclusion*

We conclude that certification counsel here did not provide ineffective assistance at the certification hearing, applying the framework set forth in *Strickland*, and thus we affirm the juvenile court's judgment.

_____

Gary M. Gaertner, Jr., J.

Rebeca Navarro-McKelvey, P.J., and
James M. Dowd, J., concur.